1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JIMMIE THOMPSON,

11              Petitioner,              No. CIV S-05-1708 GEB EFB P

12        vs.

13   THOMAS L. CAREY,                    FINDINGS AND RECOMMENDATIONS

14              Respondent.

15   _____/

16        Petitioner is a former state prisoner with counsel seeking a writ of habeas corpus.  *See* 28

17   U.S.C. § 2254.  He challenges decisions made in 2000, 2001, 2003 and 2004 to deny him release

18   on parole.  On September 27, 2007, after this action was submitted, petitioner was released on

19   parole.  Pet.'s Not. of Release on Parole at 1.  Thereafter, the court directed the parties to address

20   whether petitioner had exhausted all available state remedies and whether petitioner was entitled

21   to be discharged from parole.  Briefing on those matters is submitted.  For the reasons stated

22   below, the court finds that petitioner exhausted his state remedies and that petitioner is entitled to

23   habeas relief (in the form of discharge from parole).  Accordingly, the court recommends that

24   petitioner's application for a writ of habeas corpus be granted.[1]

25   _____

26        [1] On February 17, 2007, petitioner filed a motion for partial summary judgment.  He
     asserts that there is no genuine issue for trial on his claims that the record does not contain "some
     evidence" to support the decisions to deny him release on parole in 2000, 2001, 2003 and 2004.
     (cont.)

PROCEDURAL BACKGROUND

On December 9, 1983, petitioner was convicted in Los Angeles County Superior Court of second degree murder with a firearm for having shot and killed his ex-wife, Gladys Thompson. Ans., Ex. 1. The court sentenced him to serve a term of 15 years to life in prison. *Id.* The state appellate court affirmed the judgment and the California Supreme Court declined to review the appellate court's decision. Petitioner commenced his prison term in January 1986. Pet. at 16.

On May 4, 2000, the Board of Prison Hearings ("Board"), then the Board of Prison Terms, found petitioner not suitable for parole. App. Ct. Rec., at 26-27.[2] On April 25, 2001, petitioner filed a petition for a writ of habeas corpus in Kern County Superior Court, challenging the Board's decision. Ans. at 3. On May 15, 2001, the court issued a reasoned decision denying the petition. *Id.*

On July 20, 2001, petitioner filed a petition for a writ of habeas corpus with the California Court of Appeal for the Fifth Appellate District, challenging the May 4, 2000 denial of parole. *Id.* While that action was pending, petitioner had subsequent parole determination hearings in 2001, 2003, and 2004. In each of those hearings he was found suitable for parole but California Governors Davis and Schwarzenegger rejected the Board's findings and concluded that petitioner was not suitable for parole.[3] The state appellate court directed the California Attorney General to supplement the record with the proceedings leading to each of these denials, and consolidated consideration thereof with the initial petition. Ultimately, on February 23,

---

Respondent argues the motion for summary judgment should be stricken and/or denied because it "is duplicative of the Traverse; it simply reiterates Petitioner's assertion that there is not 'some evidence' to support" the decisions to deny him parole. Because this court recommends that petitioner's application for a writ of habeas corpus be granted, petitioner's motion for summary judgment is denied as moot.

[2] On June 4, 2007, the court ordered respondents to file a complete copy of the state appellate court record, as required by Rule 5 of the Rules Governing Section 2254 Cases.

[3] The Board also found petitioner suitable for parole in 2002, but that decision was not approved because of a tape malfunction (leaving no record of the complete parole hearing). Pet. at 31.

1   2005, that court denied relief without any explanation.  Ans. at 3, Ex. 4 at 28.

2       Petitioner sought review in the California Supreme Court, challenging the Board's 2000

3   denial of parole and the reversals of parole by Governors Davis and Schwarzenegger in 2001,

4   2003, and 2004.  Ans. at 10.  On February 23, 2005, that petition was summarily denied.  *Id.*

5       On September 28, 2005, the Board again found petitioner suitable for parole, but on

6   February 15, 2006, Governor Schwarzenegger again reversed the Board's decision.  Pet.'s Jan.

7   16, 2008 Status Report, Ex. A.  Petitioner challenged that reversal in a petition for writ of habeas

8   corpus, and on August 20, 2007, the Los Angeles County Superior Court found that the

9   Governor's 2006 reversal was not based on some evidence that petitioner presents an

10  unreasonable risk of danger to public safety, reinstated petitioner's parole date, and allowed the

11  Governor to review that grant anew in compliance with due process.  *Id.*  On September 19,

12  2007, the Governor declined to review the Board's parole grant; therefore, petitioner was

13  released on parole on September 27, 2007 for a maximum parole period of five years.  Pet.'s

14  Status Rep., Exs. B, C.  When petitioner was released on parole, he had spent nearly 22 years in

15  prison.

16                          FACTUAL BACKGROUND

17      This court takes the facts of the offense, which have not changed over the years, from a

18  report prepared in anticipation of petitioner's 1993 parole suitability hearing:

19              On February 11, 1983, [petitioner] observed his wife, Gladys
                Thompson, riding in a vehicle with a male companion.  When the
20              vehicle stopped for a traffic signal, [petitioner] drove alongside the
                car and fired a handgun into the car, striking Gladys Thompson in
21              the head.  The companion who was driving the car, drove from the
                scene and was pursued by [petitioner] who continued to fire shots
22              at the vehicle.  The victim's companion subsequently evaded
                [petitioner] and called the paramedics.  Glady[s] Thompson was
23              later pronounced dead at a hospital.  The victim was the estranged
                wife of [petitioner].  The victim and [petitioner] had been married
24              for more than 15 years and were the parents of two teenage
                children.

25

26  App. Ct. Rec., at 339.

                              3

DISCUSSION

I.    <u>Standards of Review Applicable to Habeas Corpus Claims</u>

Pursuant to 28 U.S.C. § 2254, a person in custody under a state court judgment may apply for a writ of habeas corpus "on the ground he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Because petitioner filed his application for a writ after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), the writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* § 2254(d) (referenced herein as § 2254(d) or AEDPA); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

Under the "contrary to" clause of § 2254(d)(1), a writ may be granted if the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases, 'or if it confronts a set of facts that are materially indistinguishable from a decision' of the Supreme Court and nevertheless arrives at a different result."  *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams*, 529 U.S. at 405-06).  Under the "unreasonable application" clause, a writ may be granted if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  *Williams*, 529 U.S. at 413.

In determining whether the state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the last reasoned state court decision addressing the merits of the petitioner's claim.  *Robinson v. Ignacio*, 360 F.3d

1044, 1055 (9th Cir. 2004).  If, however, there is no reasoned state court decision, the district

court must independently review the record to determine whether the state court's ruling was

contrary to or an unreasonable application of clearly established federal law.  *Delgado v. Lewis*,

223 F.3d 976, 981-82 (9th Cir. 2000).

II.   Effect of Petitioner's September 2007 Release on Parole

After petitioner was released on parole, his counsel notified the court of his release and

argued that the matters raised in the petition are not moot because petitioner must serve a

five-year term on parole, and that, but for the constitutional violations asserted in the petition, he

already would have been discharged therefrom.  Pet.'s Not. of Release on Parole at 1-2.

Petitioner asserted that he "still urgently requires relief from this Court in the form of an order

that he be discharged from his parole term."  *Id.* at 2.  The court then issued an order stating that

"[t]he law is clear that the conditions and restrictions imposed on a parolee constitute

'custody' so as to vest a federal court with jurisdiction over the petitioner under 28 U.S.C.

§ 2254," but noting that "petitioner has not alleged that he has exhausted the claim he now

wishes to pursue or that there is any basis in law for granting the relief he seeks."  Nov. 16, 2007

Order at 2.  Therefore, the court requested briefing on those issues.  *Id.*

A.   Mootness

Petitioner contends that his claims are not moot because, if the petition is granted, "it

would render [petitioner's] custody on parole unconstitutional, for he would be entitled to have

his excess time in prison confinement applied to his parole period and his discharge from

parole."  Pet.'s Jan. 16, 2008 Status Report at 2.  As discussed below, the question is

fundamental to this court's jurisdiction.

Federal courts have jurisdiction to hear cases and controversies.  U.S. CONST. art. III, § 2.

They "have no jurisdiction to hear a case that is moot, that is, where no actual or live controversy

exists."  *Foster v. Carson*, 347 F.3d 742, 745 (9th Cir. 2003).  "To avoid dismissal on mootness

grounds, the court must determine that the habeas petitioner continues to have a 'personal stake

1   in the outcome of the lawsuit.'"  *Bush v. Solis*, 2004 WL 2600141, at *2 (N.D. Cal. Nov. 16,

2   2004) (quoting *United States v. Verdin*, 243 F.3d 1174, 1177 (9th Cir. 2000)).  What this means

3   is that, "throughout the litigation, the plaintiff must have suffered, or be threatened with, an

4   actual injury traceable to the defendant and likely to be redressed by a favorable decision."

5   *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (internal quotation marks and citations omitted).

6         In short, a case loses its quality as a "present, live controversy" and becomes moot when

7   the court cannot grant any effective relief.  *Cantrell v. City of Long Beach*, 241 F.3d 674, 678

8   (9th Cir. 2001).[4]  Therefore, in evaluating whether petitioner's habeas petition is moot, the court

9   must first consider the nature of habeas corpus relief and then determine whether it can grant

10   petitioner any effective habeas relief.  *See Burnett v. Lampert*, 432 F.3d 996, 999 (9th Cir. 2005).

11         At its core, a petition for a writ of habeas corpus seeks relief from restraint on liberty.  It

12   "is an attack by a person in custody upon the legality of that custody."  *Preiser v. Rodriguez*, 411

13   U.S. 475, 484 (1973).  Thus, "the traditional function of the writ is to secure release from illegal

14   custody."  *Id.*  Within the rubric of habeas corpus, however, the federal courts are "free to

15   fashion the remedy as law and justice require," and can do more than just "order petitioner's

16   immediate release from physical custody."  *Sanders v. Ratelle*, 21 F.3d 1446, 1461 (9th Cir.

17   1994).

18         The remedial reach of a writ of habeas corpus is not limited to petitions challenging the

19   legality of confinement in a prison.  The law is well-settled that the restrictions a state imposes

20   on a parolee are sufficient to satisfy the "in custody" requirement of 28 U.S.C. § 2254.  *Jones v.*

21   *Cunningham*, 371 U.S. 236, 238 (1963); *see also Spencer*, 523 U.S. at 7 ("An incarcerated

22   convict's (or a parolee's) challenge to the validity of his conviction always satisfies the

23   case-or-controversy requirement, because the incarceration (or the restriction imposed by the

24   terms of the parole) constitutes a concrete injury, caused by the conviction and redressable by

25

26         [4]  "The burden of demonstrating mootness is a heavy one."  *Basque v. Schwartz*, 2009
      WL 187920, at *1 (E.D. Cal. Jan. 20, 2009) (citing *Cantrell*, 241 F.3d at 678).

1  invalidation of the conviction.").  Whether the restrictions on the petitioner's liberty are due to

2  his confinement in a cell or due to confinement of his activities and movement outside of the

3  prison, the principle of redressibility is the same.  The existence of a case-or-controversy will

4  therefore turn on whether the limitations on the petitioner's freedom would not be present if his

5  petition were granted.  Thus, the habeas action of a prisoner challenging the validity of his

6  conviction is not rendered moot by his release to parole.

7       The Ninth Circuit has visited this very question.  In *McQuillion v. Duncan*, 306 F.3d 895,

8  912 (9th Cir. 2002) ("*McQuillion I*"), the Ninth Circuit determined that the appropriate remedy

9  for a state prisoner whose parole date had been rescinded in violation of due process was

10 immediate release.  However, there had been at least a three-year delay between the

11 constitutional injury, i.e., the illegal restraint, and the grant of habeas relief.  *McQuillion v.*

12 *Duncan*, 342 F.3d 1012, 1015 (9th Cir. 2003) ("*McQuillion II*").  Thus, in response to the

13 California Attorney General's later assertion that the appropriate relief was release to a state-

14 mandated three-year period of parole, the Ninth Circuit explained:

15            This argument overlooks the fact that if McQuillion had been
             released on the date to which he was entitled, he would have been
16            released in May 1994.  The three-year parole, which he would
             have been required to serve if he had been released on time, has
17            long since expired.

18 *McQuillion II*, 342 F.3d at 1015.  Thus, the reach of remedy extends not only to addressing

19 physical confinement in an institution, but also to addressing restrictions on liberty imposed as

20 conditions of release on parole.  *Id.*; *see also Bush*, 2004 WL 2600141, at *2 ("This court's

21 power to grant habeas relief includes the ability to . . . change the conditions of his supervised

22 release"); *Carlin v. Wong*, 2008 WL 3183163, at *2 (N.D. Cal. Aug. 4, 2008) ("Here, petitioner

23 is entitled to credit against his parole period for his time in confinement that was in violation of

24 his due process rights.  Had respondent not violated petitioner's due process rights by denying

25 parole on December 15, 2003, petitioner would have been released when the parole suitability

26 determination became final after the 150 day review period.").  Accordingly, where a prisoner

should have been paroled but unconstitutionally is held in prison, the unconstitutional confinement can consume the period of time the state could have lawfully subjected the prisoner to the lesser restraint of parole.

That principle applies here.  Petitioner challenges his denials of parole in 2000, 2001, 2003, and 2004.  Given that petitioner's maximum parole term is five years, if petitioner had been paroled in 2000, as he contends he should have, he would have been discharged from parole in 2005.  Likewise, if he had been paroled in 2001, he would have been discharged in 2006; if he had been paroled in 2003, he would have been discharged in 2008; and if he had been paroled in 2004, he would be discharged in 2009.

Respondent argues that the "fundamental flaw" in petitioner's claim is his premise that he served an excess term.  According to respondent, "unlike the inmate in the cases [petitioner] cites, [petitioner] did not serve more time than he should have; he was still properly serving his life term, and therefore, he is still properly on parole now."  Resp.'s Jan. 23, 2008 Status Report at 7-8; *see*, *e.g.*, *In re Bush*, 161 Cal.App.4th 133, 144-45 (2008) (quoting *McQuillion II*) (internal citations omitted) ("In effect, the *McQuillion* court determined that the prisoner was not lawfully in custody during the nine years following his original parole date because the rescission of that date was not supported by 'some evidence.'  The prisoner was therefore entitled to a credit of this unlawful custody time against his three-year parole period.  Bush, by contrast, was lawfully in custody pending a determination that he could be safely paroled, and he was not entitled to be released until the Board's suitability determination became final . . . .").  However, respondent's argument fails to consider that any time petitioner served beyond the date that he properly should have been paroled is excessive.  Fundamentally, if petitioner should have been paroled in 2000, 2001, 2003, or 2004, any time that he served beyond that would have been "in excess."  In other words, respondent does not account for the possibility that petitioner might prevail on his due process claims.

////

1    As this court may still grant petitioner effective relief, he still has a "personal stake" in

2    the outcome of this litigation and it is not moot.[5]

3         B.    Exhaustion

4         Respondent argues that petitioner has not exhausted his claim that he should be

5    discharged from parole.  Therefore, he argues, petitioner is barred from pressing that claim in

6    this action.  Resp.'s Jan. 23, 2008 Status Report at 2-3.  Thus, parsing the challenge to the parole

7    denial in this fashion, respondent contends that petitioner "never fairly presented the operative

8    facts and legal theories he now offers." *Id.* at 3.  Petitioner counters that his petition necessarily

9    encompassed within it "a challenge that each day he spent in prison beyond the date of the

10   decision refusing to parole him constituted unconstitutional confinement" and that "[t]he State

11   courts, in denying [petitioner's] challenges to the refusals to parole him, necessarily pretermitted

12   [his] claims as to when his parole period should rightfully have begun."  Pet.'s Jan. 16, 2008

13   Status Report at 4-5.  Therefore, petitioner argues, his claims were exhausted. *Id.* at 5.

14        Respondent's parsing of the challenge to the parole denial that petitioner presented in the

15   state court is an unduly narrow construction of that challenge.  The petitioner has repeatedly

16   asserted in his several state court petitions that the persistent denial of parole without some

17   evidence of danger to public safety violates due process.  As discussed above, any relief to which

18   he might be entitled would include relief from the constrictions of parole if it is determined that

19   _____

20        [5] Some district court cases have found that release on parole moots a habeas petition
     seeking such release because the petitioner "has effectively obtained the relief" he sought in his
21   petition. *Williams v. Kane*, 2008 WL 5458952, at *2 (C.D. Cal. Dec. 31, 2008); *see also Ellis v.
     Campbell*, 2007 WL 2009802, at *3 (E.D. Cal. July 6, 2007) ("The relief petitioner seeks in his
22   amended petition is release on parole. . . . [S]ince petitioner has obtained [that] relief . . . , this
     action is moot."); *Fisher v. Flores*, 2007 WL 686664, at *2 (D. Ariz. Mar. 1, 2007) ("[B]ecause
23   the only relief sought by Petitioner was his release from detention and Petitioner has been
     released from detention, as acknowledged by Petitioner, the petition is moot.").  However, at the
24   commencement of this action, petitioner requested that this court "[v]acate [the] decision of the
     Board in 2000, Governor Davis's decisions in 2001 and 2003, and Governor Schwarzenegger's
25   decision in 2004, and order Petitioner released on parole . . . or any other relief to which
     petitioner may be entitled."  Pet. at 15.  There does not appear to be any requirement that
26   petitioner "spell out the precise details of the remedy requested in his petition."  *Martin v.
     Marshall*, 448 F. Supp. 2d 1143, 1145 (N.D. Cal. 2006).

1    his release date should have been early enough that he has now served a period of excessive

2    incarceration that exceeds the parole term.  Petitioner does not make any new and unexhausted

3    claims in this action.  He only seeks to show that this court can grant effective relief.  His claim

4    was and continues to be that the repeated denial of parole was not supported by any evidence

5    that he presents an unreasonable risk of danger.  That claim is unchanged by his release.  Rather,

6    the intervening release simply raised the question of whether granting the petition would remedy

7    a live case or controversy.

8         There is no doubt that, to properly exhaust his claim, petitioner needed to fairly present

9    that claim to the state courts before seeking relief in federal court.  *Picard v. Connor*, 404 U.S.

10   270, 276 (1971); *Weaver v. Thompson*, 197 F.3d 359, 365 (9th Cir. 1999).  It is also clear that "a

11   claim for relief in habeas corpus must include reference to a specific federal constitutional

12   guarantee, as well as a statement of the facts that entitle the petitioner to relief."  *Picard*, 404

13   U.S. at 271; *Davis v. Silva*, 511 F.3d 1005, 1009 (9th Cir. 2008).  Petitioner has met those

14   requirements here.  But a petitioner may also support his claims in federal court with facts not

15   alleged in state court, as long as those facts do not "fundamentally alter the legal claim already

16   considered by the state courts."  *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986); *Davis*, 511 F.3d

17   at 1009.  Petitioner presented to the state courts the constitutional claims he raises herein about

18   his 2000, 2001, 2003, and 2004 parole denials, as well as the facts that would entitle him to

19   relief.  There is simply no merit to the contention that he was also required to present to the state

20   courts a separate request to be discharged from parole restrictions.  Such a remedy would

21   necessarily flow from a decision to grant those claims that he was wrongfully denied parole.

22   Although petitioner's recent release from prison has mooted part of the remedy sought in this

23   case, his petition still encompasses a request for relief from the parole restrictions.  The latter is

24   not a separate claim, but simply a narrower remedy.

25        The new facts regarding petitioner's release and the narrowing of the specific relief now

26   requested by petitioner do not "fundamentally alter the legal claim already considered by the

1  state courts" – specifically, that the 2000, 2001, 2003, and 2004 denials of parole violated

2  petitioner's due process rights.  *Vasquez*, 474 U.S. at 260.  Therefore, petitioner has properly

3  exhausted the claims raised in his petition.

4       C.    Question of State Law

5       Respondent further argues that the petition should be denied because "the question

6  whether [petitioner] must serve his entire five-year parole period is a question of the proper

7  interpretation of state law, and therefore, not amenable to federal habeas relief."  Resp.'s Jan. 23,

8  2008 Status Report at 4.  Respondent also contends that the petition should be denied because

9  petitioner's parole period could not commence until he was actually released on parole, and that

10  public safety concerns require the parole period to be served.  *Id.* at 5-6.

11       A federal court may grant a prisoner's petition for writ of habeas corpus under 28 U.S.C.

12  § 2254 if the prisoner is being held in custody in violation of the federal constitution or a federal

13  law.  As discussed above, a parolee is considered "in custody" for habeas purposes.  Therefore, if

14  this court finds that petitioner's current custody violates his federal due process rights, it is free

15  to fashion a remedy "as law and justice require," and its authority extends beyond the authority

16  "to order petitioner's immediate release from physical custody."  *Sanders*, 21 F.3d at 1461.

17       As already discussed, petitioner's argument that he should be discharged from parole

18  does not make any new claims about the constitutionality of his custody – he continues to argue

19  that his 2000, 2001, 2003, and 2004 parole denials violated his due process rights and that he is

20  therefore illegally in custody.  That claim does not arise out of state law.  Indeed, petitioner's

21  discussion of state law is only relevant for purposes of determining whether he has already

22  served a period of incarceration that exceeds the required parole term.  Because petitioner's

23  constitutional violation claims involve the interpretation and application of federal law, they are

24  cognizable in this habeas action.  The fact that the remedy petitioner seeks may involve the

25  application of state law does not make his habeas claims non-cognizable.

26  ////

1   III.    <u>Petitioner's Claims</u>

2         Petitioner contends that the 2000, 2001, 2003, and 2004 decisions to deny him release on

3   parole violated his due process rights under the United States Constitution.[6]

4         A.    <u>Due Process in the California Parole Context</u>

5         The Due Process Clause of the Fourteenth Amendment prohibits state action that

6   deprives a person of life, liberty, or property without due process of law.  One alleging a due

7   process violation must first demonstrate that he was deprived of a liberty or property interest

8   protected by the Due Process Clause and then show that the procedures attendant upon the

9   deprivation were not constitutionally sufficient.  *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454,

10   459-60 (1989); *McQuillion I*, 306 F.3d at 900.

11         A protected liberty interest may arise from either the Due Process Clause of the United

12   States Constitution or state laws.  *Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1987).  The United

13   States Constitution does not, of its own force, create a protected liberty interest in a parole date,

14   even one that has been set.  *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981).  However, "a state's

15   statutory scheme, if it uses mandatory language, 'creates a presumption that parole release will

16   be granted' when or unless certain designated findings are made, and thereby gives rise to a

17   constitutional liberty interest."  *McQuillion I*, 306 F.3d at 901 (quoting *Greenholtz v. Inmates of*

18   *Neb. Penal*, 442 U.S. 1, 12 (1979)).

19         California's parole scheme gives rise to a cognizable liberty interest in release on parole,

20   even for prisoners who have not already been granted a parole date.  *Sass v. Cal. Bd. of Prison*

21   *Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006); *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir.

22   2003); *McQuillion I*, 306 F.3d at 903; *see also In re Lawrence*, 44 Cal.4th 1181, 1204, 1210,

23   1221 (2008).  The Supreme Court has clearly established that a parole board's decision deprives

24

25        [6] Petitioner also argues that the Governor's reversals of his parole grants in 2001, 2003, and 2004 violated the ex post facto clause and that his continued confinement violates the federal prohibition on cruel and unusual punishment.  Pet. at 30-31.  However, because this court finds

26   that petitioner's writ should be granted on alternative grounds, those issues need not be reached.

1   a prisoner of due process with respect to his constitutionally protected liberty interest in a parole

2   release date if the board's decision is not supported by 'some evidence in the record,' or is

3   'otherwise arbitrary.'"   *Irons v. Carey*, 505 F.3d 846, 851 (9th Cir. 2007) (quoting

4   *Superintendent v. Hill*, 472 U.S. 445, 457 (1985)).  "The 'some evidence' standard is minimally

5   stringent," and a decision will be upheld if there is any evidence in the record that could support

6   the conclusion reached by the factfinder.  *Powell v. Gomez*, 33 F.3d 39, 40 (9th Cir. 1994) (citing

7   *Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987)); *Toussaint v. McCarthy*, 801 F.2d 1080, 1105

8   (9th Cir. 1986).  However, "the evidence underlying the board's decision must have some indicia

9   of reliability."  *Jancsek v. Or. Bd. of Parole*, 833 F.2d 1389, 1390 (9th Cir. 1987); *see also*

10  *Perveler v. Estelle*, 974 F.2d 1132, 1134 (9th Cir. 1992).  Determining whether the "some

11  evidence" standard is satisfied does not require examination of the entire record, independent

12  assessment of the credibility of witnesses, or the weighing of evidence.  *Toussaint*, 801 F.2d at

13  1105.  The question is whether there is any reliable evidence in the record that could support the

14  conclusion reached.  *Id.*

15      Under California law, the Governor considers the same factors as the Board in

16  determining whether to affirm or reverse the Board's parole decision.  Cal. Const., art. V, § 8(b);

17  *In re Rosenkrantz*, 29 Cal.4th 616, 660 (2002).  Therefore, the Governor's decision to reverse a

18  parole grant is reviewed under the same procedural due process principles that are used to review

19  challenges to the Board's denial of parole.

20      When assessing whether a state parole board's suitability decision, or the Governor's

21  reversal of the Board's suitability decision, was supported by "some evidence," the analysis "is

22  framed by the statutes and regulations governing parole suitability determinations in the relevant

23  state."  *Irons*, 505 F.3d at 851.  This court must:

24  ////

25  ////

26  ////

13

1                look to California law to determine the findings that are necessary
2                to deem a prisoner unsuitable for parole, and then must review the
               record in order to determine whether the state court decision holding
3                that these findings were supported by "some evidence" in
               [petitioner's] case constituted an unreasonable application of the
               "some evidence" principle articulated in *Hill*.

4 *Id.*

5        Under California law, prisoners serving indeterminate prison sentences "may serve up to

6 life in prison, but [] become eligible for parole consideration after serving minimum terms of

7 confinement." *In re Dannenberg*, 34 Cal.4th 1061, 1078 (2005). The Board normally sets a

8 parole release date one year prior to the inmate's minimum eligible parole release date, and does

9 so "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in

10 respect to their threat to the public." *In re Lawrence*, 44 Cal.4th at 1202 (citing Cal. Penal Code

11 § 3041(a)). A release date *must* be set "unless [the Board] determines that the gravity of the

12 current convicted offense or offenses, or the timing and gravity of current or past convicted

13 offense or offenses, is such that consideration of the *public safety* requires a more lengthy period

14 of incarceration . . . and that a parole date, therefore, cannot be fixed . . . ." Cal. Penal Code

15 § 3041(b) (emphasis added).

16        To carry out the mandate of section 3041, the Board must determine "whether the inmate

17 poses '*an unreasonable risk of danger to society if released from prison*,' and thus whether he or

18 she is suitable for parole." *In re Lawrence*, 44 Cal.4th at 1202 (citing Cal. Code Regs. tit. 15,

19 § 2281(a)) (emphasis added). In doing so, the Board must consider all relevant, reliable

20 information available regarding

21                the circumstances of the prisoner's social history; past and present
               mental state; past criminal history, including involvement in other
22                criminal misconduct which is reliably documented; the base and
               other commitment offenses, including behavior before, during and
23                after the crime; past and present attitude toward the crime; any
               conditions of treatment or control, including the use of special
24                conditions under which the prisoner may safely be released to the
               community; and any other information which bears on the
25                prisoner's suitability for release.

26 Cal. Code Regs. tit. 15, § 2281(b).

1    The regulation identifies circumstances that tend to show suitability or unsuitability for
2    release. *Id.* § 2281(c) & (d). Circumstances that tend to show that a prisoner is suitable for
3    release are identified as: (1) the prisoner has no juvenile record of assaulting others or
4    committing crimes with a potential of personal harm to victims; (2) the prisoner has experienced
5    reasonably stable relationships with others; (3) the prisoner has performed acts that tend to
6    indicate the presence of remorse or has given indications that he understands the nature and
7    magnitude of his offense; (4) the prisoner committed his crime as the result of significant stress
8    in his life; (5) the prisoner's criminal behavior resulted from having been victimized by battered
9    women syndrome; (6) the prisoner lacks a significant history of violent crime; (7) the prisoner's
10   present age reduces the probability of recidivism; (8) the prisoner has made realistic plans for
11   release or has developed marketable skills that can be put to use upon release; and (9)
12   institutional activities indicate an enhanced ability to function within the law upon release. *Id.*
13   § 2281(d).

14   Circumstances that tend to indicate unsuitability for release are listed as: (1) the prisoner
15   committed the offense in an especially heinous, atrocious, or cruel manner; (2) the prisoner had a
16   previous record of violence; (3) the prisoner has an unstable social history; (4) the prisoner's
17   crime was a sadistic sexual offense; (5) the prisoner had a lengthy history of severe mental
18   problems related to the offense; and (6) the prisoner has engaged in serious misconduct in prison.
19   *Id.* § 2281(c). Factors to consider in deciding whether the prisoner's offense was committed in
20   an especially heinous, atrocious, or cruel manner include: (A) multiple victims were attacked,
21   injured, or killed in the same or separate incidents; (B) the offense was carried out in a
22   dispassionate and calculated manner, such as an execution-style murder; (C) the victim was
23   abused, defiled or mutilated during or after the offense; (D) the offense was carried out in a
24   manner that demonstrated an exceptionally callous disregard for human suffering; and (E) the
25   motive for the crime is inexplicable or very trivial in relation to the offense. *Id.* § 2281(c)(1)(A)
26   - (E).

1    In California, the overriding concern in determining parole suitability is public safety and

2   the focus is on the inmate's current dangerousness.  *In re Dannenberg*, 34 Cal.4th at 1086; *In re*

3   *Lawrence*, 44 Cal.4th at 1205.  The California Supreme Court recently stated:

4        [T]he Penal Code and corresponding regulations establish that the
         fundamental consideration in parole decisions is public safety
5        [and] the core determination of "public safety" . . . involves an
         assessment of an inmate's *current* dangerousness. . . . [A] parole
6        release decision authorizes the Board (and the Governor) to
         identify and weigh only the factors relevant to predicting "whether
7        the inmate will be able to live in society without committing
         additional antisocial acts."  These factors are designed to guide an
8        assessment of the inmate's threat to society, *if released*, and hence
         could not logically relate to anything but the threat *currently* posed
9        by the inmate.

10   *In re Lawrence*, 44 Cal.4th at 1205-06 (internal citations omitted).  Accordingly, in reviewing a

11   decision by the Board or the Governor to deny parole to an inmate, "the relevant inquiry is

12   whether some evidence supports the decision of the Board or the Governor that the inmate

13   constitutes a current threat to public safety, and not merely whether some evidence confirms the

14   existence of certain factual findings."  *Id.* at 1212 (citing *In re Rosenkrantz*, 29 Cal.4th at 658; *In*

15   *re Dannenberg*, 34 Cal.4th at 1071; *In re Lee*, 143 Cal.App.4th 1400, 1408 (2006)).

16       Additionally, in recent years the Ninth Circuit Court of Appeals has admonished that,

17   given the liberty interest that California prisoners have in release on parole, a continued reliance

18   upon an unchanging factor to support a finding of unsuitability for parole over time constitutes a

19   violation of due process.  The court has addressed the issue in three significant cases, each of

20   which is discussed below.

21       First, in *Biggs*, the Ninth Circuit recognized that a continued reliance on an unchanging

22   factor to deny parole, such as the circumstances of the offense, could at some point result in a

23   due process violation.[7]  While the court in *Biggs* rejected several of the reasons given by the

24   Board for finding the petitioner in that case unsuitable for parole, it upheld three:  (1) petitioner's

25   _____

26       [7]  That holding has been acknowledged as representing the law of the circuit.  *Irons*, 505
     F.3d at 853; *Sass*, 461 F.3d at 1129.

1   commitment offense involved the murder of a witness; (2) the murder was carried out in a

2   manner exhibiting a callous disregard for the life and suffering of another; and (3) petitioner

3   could benefit from therapy.  *Biggs*, 334 F.3d at 913.  However, the court in *Biggs* cautioned that

4   continued reliance solely upon the gravity of the offense of conviction and petitioner's conduct

5   prior to committing that offense in denying parole could, at some point, violate due process.  In

6   this regard, the court observed:

7               As in the present instance, the parole board's sole supportable
            reliance on the gravity of the offense and conduct prior to
8           imprisonment to justify denial of parole can be initially justified as
            fulfilling the requirements set forth by state law.  Over time,
9           however, should Biggs continue to demonstrate exemplary
            behavior and evidence of rehabilitation, denying him a parole date
10          simply because of the nature of Biggs' offense and prior conduct
            would raise serious questions involving his liberty interest in
11          parole.

12  *Id.* at 916.  The court in *Biggs* also stated that "[a] continued reliance in the future on an

13  unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs

14  contrary to the rehabilitative goals espoused by the prison system and could result in a due

15  process violation."  *Id.* at 917.

16      In *Sass*, the Board found the petitioner unsuitable for parole at his third suitability

17  hearing based on the gravity of his offenses of conviction in combination with his prior offenses.

18  461 F.3d at 1126.  Citing *Biggs*, the petitioner in *Sass* contended that reliance on these

19  unchanging factors violated due process.  The court disagreed, concluding that these factors

20  amounted to "some evidence" to support the Board's determination.  *Id.* at 1129.  The court

21  provided the following explanation for its holding:

22              While upholding an unsuitability determination based on these
            same factors, we previously acknowledged that "continued
23          reliance in the future on an unchanging factor, the circumstance of
            the offense and conduct prior to imprisonment, runs contrary to the
24          rehabilitative goals espoused by the prison system and *could* result
            in a due process violation."  *Biggs*, 334 F.3d at 917 (emphasis
25          added).  Under AEDPA it is not our function to speculate about
            how future parole hearings could proceed.  *Cf. id.*  The evidence of
26          Sass' prior offenses and the gravity of his convicted offenses

1    constitute some evidence to support the Board's decision.
     Consequently, the state court decisions upholding the denials were
2    neither contrary to, nor did they involve an unreasonable
     application of, clearly established Federal law as determined by the
3    Supreme Court of the United States.  28 U.S.C. § 2254(d).

4    *Id.*

5        In *Irons,* the Ninth Circuit sought to harmonize the holdings in *Biggs* and *Sass*, stating as

6    follows:

7        Because the murder Sass committed was less callous and cruel
         than the one committed by Irons, and because Sass was likewise
8        denied parole in spite of exemplary conduct in prison and evidence
         of rehabilitation, our decision in *Sass* precludes us from accepting
9        Iron's due process argument or otherwise affirming the district
         court's grant of relief.

10
         We note that in all the cases in which we have held that a parole
11       board's decision to deem a prisoner unsuitable for parole solely on
         the basis of his commitment offense comports with due process,
12       the decision was made before the inmate had served the minimum
         number of years required by his sentence.  Specifically, in *Biggs*,
13       *Sass*, and here, the petitioners had not served the minimum number
         of years to which they had been sentenced at the time of the
14       challenged parole denial by the Board.  *Biggs*, 334 F.3d at 912;
         *Sass*, 461 F.3d at 1125.  All we held in those cases and all we hold
15       today, therefore, is that, given the particular circumstances of the
         offenses in these cases, due process was not violated when these
16       prisoners were deemed unsuitable for parole prior to the expiration
         of their minimum terms.

17
         Furthermore, we note that in *Sass* and in the case before us there
18       was substantial evidence in the record demonstrating
         rehabilitation. In both cases, the California Board of Prison Terms
19       appeared to give little or no weight to this evidence in reaching its
         conclusion that Sass and Irons presently constituted a danger to
20       society and thus were unsuitable for parole.  We hope that the
         Board will come to recognize that in some cases, indefinite
21       detention based solely on an inmate's commitment offense,
         regardless of the extent of his rehabilitation, will at some point
22       violate due process, given the liberty interest in parole that flows
         from the relevant California statutes.  *Biggs*, 334 F.3d at 917.

23

24   *Irons*, 505 F.3d at 853-54.[8]

25   _____

26   [8]  The California Supreme Court has also acknowledged that the aggravated nature of the
     commitment offense, over time, may fail to provide some evidence that the inmate remains a

B.    Petitioner's 2004 Denial

After finding petitioner suitable for parole in 2001, 2002, and 2003, on June 24, 2004, the Board again found petitioner suitable for parole.  Significantly, the Board stated that "if this prisoner is not suitable, then there's no such thing as a life prisoner who's suitable for parole." Ans., Ex. 3b at 111.  However, on November 19, 2004, the Governor reversed the Board's grant of parole to petitioner.  Ans., Ex. 2.  Petitioner argues that the Governor's 2004 reversal violated his constitutional due process rights because it was not supported by any evidence that petitioner posed a current danger to society.  Pet. at 44-45.  Respondent counters that the Governor's reversal was supported by "some evidence" and is not contrary to or an unreasonable application of clearly established federal law, and that therefore the Governor's decision should be upheld. Ans. at 10.  Because there are no reasoned state court opinions addressing this claim, this court will independently review the record to determine whether the state court's denial of this claim was contrary to or involved an unreasonable application of clearly established federal law.

In 2004, the Board found petitioner suitable for parole because: (1) he had no juvenile record; (2) he had no adult record prior to the commitment offense; (3) he contributed to society before entering prison by "serv[ing] honorably in the United States Navy from 1963 to 1967" (which "was during the Vietnam era" and for which "he got an honorable discharge"); (4) he had a stable work history prior to entering prison, was a tax-paying citizen, and was "a good worker"; (5) while in prison, he "enhanced his ability to function within the law upon release" by gaining a high school diploma, an Associate's degree from Hartnell, and a Bachelor of Arts from San Jose State University; (6) he participated in various self-help programs while in prison,

---

current threat to public safety.  *In re Lawrence*, 44  Cal.4th at 1218-20 & n. 20.

Additionally, a recent panel of the Ninth Circuit in *Hayward v. Marshall*, 512 F.3d 536, 546-47 (9th Cir. 2008), determined that under the "unusual circumstances" of that case the unchanging factor of the gravity of the petitioner's commitment offense did not constitute "some evidence" supporting the governor's decision to reverse a parole grant on the basis that the petitioner would pose a continuing danger to society.  However, on May 16, 2008, the Court of Appeals decided to rehear that case en banc.  *Hayward v. Marshall*, 527 F.3d 797 (9th Cir. 2008).  Therefore, the panel decision in *Hayward* is no longer citable precedent.

including life stress management; the Laubach program, a literacy program for inmates (petitioner was both a trainer and a tutor in the program); Alcoholics Anonymous and Narcotics Anonymous (petitioner was "active . . . on an ongoing basis" and was able to articulate the steps of the programs); and religious services; (7) he had realistic parole plans, including a job offer and a place to live; (8) he had close ties with his wife; (9) he maintained positive institutional behavior (which the Board said "indicates significance in self-control") and did not have any disciplinary write-ups while in prison; (10) he was remorseful, understood the magnitude of what happened the day of the murder, accepted responsibility for the crime and his criminal behavior, and had "a desire to change towards good citizenship"; (11) the correctional, medical, and psychological staff believed petitioner posed a very low degree of threat to the public, had a desire to change to become a good citizen, and would become a productive member of society upon release; and (12) petitioner had good impulse control and would not pose a danger to himself or others.  Ans., Ex. 3b at 98-107.  The Board said that petitioner's "maturation, growth, greater understanding, and advanced age . . . reduced the probability of recidivism."  *Id.* at 100.

In reaching its conclusion, the Board indicated it considered, *inter alia*, (1) a petition from about forty people stating that petitioner would be a contributing member to society; (2) a psychologist report indicating that petitioner's behavior in prison was "simply outstanding"; (3) a psychological evaluation in which the doctor stated he felt that petitioner was remorseful for his crime; (4) notes from a correctional counselor stating: "Considering the commitment offense, lack of prior record, his prison disciplinary-free record, record of his employment, his level of education, his military service, this writer believes that [petitioner] would pose a very low degree of threat to the public at this time if released from prison"; (5) several letters from doctors petitioner had worked for, stating that petitioner was repentive, had a desire to change to become a good citizen, and would be a good citizen (one doctor even stated that if he were to go back into private practice, he would be willing to hire petitioner); (6) petitioner's most recent psychological evaluation from Dr. Charles Taylor, stating that petitioner "has an exemplary

discipline record and has upgraded himself educationally and vocationally," has marketable

skills and a productive work history, has realistic parole plans, appears socially connected to

others on the outside, accepted responsibility for the crime and showed remorse and empathy,

participated in self-help groups and is involved in helping others, does not have a criminal or

substance abuse history, and poses a low risk of dangerousness upon release; (7) a 3/17/02

psychiatric report from Dr. William Kroes, stating that "based on [petitioner's] incarceration and

present personality, there is no manifest danger to self or others," "[i]f released to the

community, [petitioner] should not present a problem to society [since he] appears to have quite

good impulse control and should be capable of controlling any sexual anger or aggressive

impulses," petitioner "has excellent social and verbal skills, presents very well, is sincere,

responsible, and a considerate man who has empathy for his fellow man," and petitioner "has the

intelligence and social skills to do well." *Id.* at 98-107. The Board said that it considered

"everything in the Governor's letter, the magnitude and the gravity of the crime" and

acknowledged that the crime was "awful." However, the Board found that the factors supporting

suitability, including petitioner's "desire to change toward good citizenship," outweighed the

gravity of his crime. *Id.* at 102-03.

Nonetheless, on November 19, 2004, Governor Schwarzenegger reversed the Board's

suitability finding. The Governor stated:

> [Petitioner] has provided his version of the events leading to his
> ex-wife's murder. His 2003 Life Prisoner Evaluation contains his
> version. He indicated that on the day of the murder, Mr. Bodin
> had disciplined [petitioner's] son and threatened [petitioner].
> When he happened to see his ex-wife and Mr. Bodin driving, he
> followed them. [Petitioner] claimed that he saw Mr. Bodin reach
> across the car as if he were going to pull a gun out of the glove
> compartment. [Petitioner] then reached underneath his car seat,
> retrieved his gun, and shot towards the car. During his 2004 parole
> hearing, he basically repeated this account. He stated that he
> thought Mr. Bodin was reaching for a gun when he pulled out his
> gun. When he fired, he shot over his shoulder towards the rear of
> his car and through the front windshield of Mr. Bodin's car. He
> claimed that he could not see inside the car due to the tinted
> windows. After the initial shot, Mr. Bodin backed up. [Petitioner]

21

admitted at the hearing that he made a U-turn, pursued Mr. Bodin, and then fired two more shots into the ground near Mr. Bodin's car.  He stated that he was not trying to kill Mr. Bodin and that the shooting of his wife was unintentional.  He blamed his actions on anger and jealousy.

[Petitioner] has been in state prison for approximately 19 years.  Prior to entering prison, it appears he led a pretty normal life.  He did not have a prior criminal record and worked 17 years for the same employer where he rose to a supervisory position.  He had two sons with the victim before the couple divorced in September 1981 – approximately a year and a half before the murder.  After he entered prison, he stayed out of trouble and has been completely discipline free.  Impressively, he earned his Associate Degree in 1989 and his Bachelor's Degree in 1992.  He has held several institutional jobs and received positive work reports.  Several correctional staff members have written reports complimenting [petitioner's] professionalism, dependability, and work ethic.  His participation in self-help and therapy programs while in prison have included attendance at Alcoholics Anonymous meetings, and therapy related to anger and stress management.  He has also volunteered numerous hours to tutor other inmates.  He has used his time in prison to better himself and to help others do the same.  These are all factors tending to support [petitioner's] release on parole.

At the 2004 parole hearing, [petitioner] told the Board that he will live with his wife and obtain another position with his former employer if he is paroled.  An investigation conducted by the Board, however, indicated that these plans may not be solid.  Investigators were unable to contact his wife or verify her address.  Additionally, they were unable to confirm the job offer by his former company.  When the company was contacted, a representative stated that *the individual who offered to assist [petitioner] in regaining a position with the employer did not have the authority to actually hire him.*  Moreover, the fact that [petitioner] had his union card only guaranteed his membership with the union and did not guarantee him a job.  *It, therefore, does not appear that [petitioner's] parole plans are realistic at this time.*

While [petitioner's] parole plans may be some cause for concern, *the overriding concern here is the gravity of his crime.*  Filled with anger and jealousy, he pursued his ex-wife and her boyfriend when he saw them in their car.  Once they were stopped at a traffic signal, he took out his gun and shot towards the front windshield.  To now claim that he did not intend to shoot anyone when he shot at the windshield while two people sat in the front seat of the car seems incredible.  And if he truly felt that his life could be in danger when Mr. Bodin allegedly reached over – even though [petitioner] admits that he never saw a gun and there is no

evidence in the record of a gun in Mr. Bodin's car – he had ample opportunity to leave the scene.  Instead, he resorted to using deadly force and shot his children's mother, eventually killing her.  After the initial shot, [petitioner] was still enraged.  He took the time to make a U-turn and chase down the victim and Mr. Bodin.  On a public street, he fired two more shots near their car.  He could have easily hit the victim, Mr. Bodin, or possibly a passerby on the street.  His actions display a complete indifference to the safety of others.  The facts of this case are atrocious and clearly exceed the minimum necessary for a second-degree murder conviction.  Based on the gravity of this crime alone, I believe that [petitioner] is unsuitable for parole at this time.

[Petitioner] has used his time wisely in prison and I encourage him to continue on this path.  But after carefully considering the same factors as the Board, I believe [petitioner] would continue to pose an unreasonable risk of danger to society if paroled at this time.  Accordingly, I REVERSE the Board of Prison Terms' 2004 decision to grant parole to [petitioner].

Ans., Ex. 2 (emphasis added).

In order to uphold the Governor's 2004 reversal of the Board's parole decision, the state courts needed to find that the Governor's decision was based on "some evidence" in the record that petitioner constituted a current threat to public safety.

1.    Lack of Realistic Parole Plans

The court first considers the Governor's finding that petitioner's parole plans were not realistic.  Although described by the Governor as not his primary reason for finding the petitioner unsuitable for parole, the Governor noted that the petitioner appeared to lack realistic parole plans because investigators were unable to contact his wife or verify her address, and when investigators called petitioner's prospective employer, a representative stated that the person who offered to help petitioner in obtaining a position there did not have authority to hire him and that even though petitioner had his union card, it guaranteed only union membership and not necessarily a job.  Ans., Ex. 2.

The verified petition points out that the Governor received this information without notice to petitioner or his counsel.  In it, the petitioner avers that the information the Governor received "was incomplete and misleading."  Pet. at 24-25.  Petitioner avers that he informed the

Board at the June 2004 parole suitability hearing that his wife had a new telephone number.  He attempted to give that number to the Board, but the Board failed to put it in the record.  *Id.* at 25. Petitioner also states that he gave the new telephone number to his counselor, who prepared the 2004 Board Report considered by the Board at the hearing.  *Id.*  Petitioner speculates that the investigator was unable to contact petitioner's wife because he called her old telephone number instead of the new one.  *Id.*

Respondent does not dispute that petitioner never received notice of the Board's investigation, the results of which were provided to the Governor, and was not given an opportunity to correct the Board's erroneous information.  Ans. at 8-9.  Respondent instead argues that due process requires no more than that petitioner be able to explain his parole plans at his hearing, which he did, and receive a decision from the Governor explaining the basis for the reversal, which was provided.  *Id.* at 9.  However, an opportunity to be heard must be meaningful and not simply cosmetic.  If the decision turns on being able to contact petitioner's wife, then a meaningful process by which petitioner can be made aware of the issue and given the chance to provide the necessary contact information is not too burdensome a procedure to ask for.  In short, respondent's argument ignores the fact that petitioner attempted to provide the proper information about his parole residence to the Board; the Board refused to take the proffered information at the time of the hearing; and the Board thereafter failed to obtain it from the counselor when it investigated petitioner's parole plans.  Under such circumstances, petitioner's alleged "unverifiable residence" did not provide some reliable evidence of petitioner's current dangerousness and therefore was insufficient to justify the Governor's decision to reverse the Board's suitability finding.

Additionally, with regard to petitioner's employment prospects, petitioner avers that "had the investigator determined all the facts available regarding employment for [petitioner], he would have learned and included in his report that [petitioner's] employment prospects [were] realistic."  *Id.*  Petitioner argues that he "had realistic parole plans in that he has a marketable

1   skill and very good job prospects with his former employer." Traverse at 17. Indeed, as

2   discussed below, his employment prospects were quite favorable. Petitioner also "had a stable

3   and reliable place to live with his wife, who has a residence and is employed." *Id.*

4          In his state appellate court proceedings, petitioner submitted a declaration from his

5   attorney asserting the following: Perry Burnell, an employee in the Sanitation department of

6   Wonderbread Bakery who years ago worked with petitioner, spoke with his manager about

7   hiring petitioner and wrote to the BPH about petitioner's job prospects there. App. Ct. Rec., at

8   1675. Counsel asserts that this manager agreed to pursue employment on petitioner's behalf, but

9   could not do so until petitioner was paroled. *Id.* Once petitioner was paroled, the manager

10  would contact Wonderbread's Human Resources department, which would then consider

11  petitioner for a job and make a decision. *Id.* Finally, counsel asserts that a parole agent with the

12  last name of Flores had contacted Mr. Burnell and Mr. Burnell had explained this to him. *Id.*

13  Respondent does not refute this evidence.

14         Although petitioner did not have a definite job offer,[9] he had marketable skills *and*

15  realistic employment possibilities, a stable and reliable place to live, and an employed spouse.

16  Therefore, petitioner had both "realistic plans for release" *and* "marketable skills that can be put

17  to use upon release." Finally, even assuming the Governor was correct in finding that

18  petitioner's parole plans were not realistic, and assuming there was evidence to support that

19  finding, in light of all of the evidence suggesting petitioner posed little to no threat of danger to

20  the public, petitioner's lack of realistic parole plans did not amount to some evidence that

21  petitioner was *currently* dangerous.

22

23         [9] Nonetheless, petitioner notes that there is no requirement that a potential parolee have a
    "definite" job offer to satisfy the factor that he have "realistic parole plans." Traverse at 17
24  (citing *Morris v. Castro*, 166 Cal.App.3d 33, 38 (1985) (prisoner must have "realistic parole
    plans" or have developed a marketable skill)). The suitability factor (notably, not an
25  *unsuitability* factor) at issue is actually whether "[t]he prisoner has made realistic plans for
    release or has developed marketable skills that can be put to use upon release." Cal. Code Regs.
26  tit. 15, § 2281(d)(8). There is no evidence that he failed to meet this criteria.

1                    2.      Gravity of the Commitment Offense

2          Governor Schwarzenegger's second (but primary) reason for reversing the Board's parole

3   decision was the gravity of petitioner's commitment offense.[10]  The Governor found that

4   petitioner's actions displayed "a complete indifference to the safety of others" and that the facts

5   of his commitment offense were "atrocious and clearly exceed[ed] the minimum necessary for a

6   second-degree murder conviction."

7          The Governor's statements that the crime was "atrocious" and that petitioner was

8   "indifferent to the safety of others" suggests that his finding of unsuitability was based on the

9   first circumstance listed in § 2281(c), that petitioner "committed the offense in an especially

10  heinous, atrocious, or cruel manner," and specifically, that petitioner's commitment offense was

11  carried out in a manner that demonstrated an exceptionally callous disregard for human

12  suffering.  *See* Cal. Code Regs. tit. 15, § 2281(c)(1), (c)(1)(D).  For this section to justify

13  overturning the Board's parole suitability finding, there must be "some evidence" to support an

14  exceptionally callous determination.

15  ////

16

_____

17       [10]  The gravity of petitioner's commitment offense was also the primary factor the
    Governor considered in his 2006 decision to reverse the Board's 2005 parole suitability finding.
18  The Governor's 2006 reversal is not at issue in this action; nonetheless, it is worth noting that on
    August 20, 2007, the Los Angeles County Superior Court found that the 2006 reversal was not
19  based on some evidence that petitioner presents an unreasonable risk of danger to public safety.
    The court stated:
20
         The circumstances of the commitment offense, in the context of the passage of 21
21       years and the lack of appropriate 'insight' as to the events of the offense do not
         constitute 'some evidence' that petitioner presents an unreasonable risk of danger
22       to public safety and therefore is unsuitable for release on parole.  The finding of
         so many previous Board findings, coupled with the well-document[ed]
23       conclusions of the Board . . . provides a significant record supporting the Court's
         finding that the Governor's reversal is not supported by the facts of this case.
24
    Pet.'s Jan. 16, 2008, Status Report, Ex. A, at 3-4.  Therefore, the state court reinstated
25  petitioner's parole date and allowed the Governor to review that grant anew in compliance with
    due process.  On September 19, 2007, the Governor declined to review the Board's parole grant,
26  and petitioner was subsequently released on parole.

1    A conviction for second degree murder cannot, of itself, satisfy the "some evidence"

2    standard.  "Second degree murder by its nature evinces a certain level of callousness because it

3    'requires express or implied malice - i.e., the perpetrator must kill another person with the

4    specific intent to do so; or he or she must cause another person's death by intentionally

5    performing an act, knowing it is dangerous to life and with conscious disregard for life.'"  *In re*

6    *Smith*, 114 Cal.App.4th 343, 366 (2003).  Therefore, "it can reasonably be said that all second

7    degree murders by definition involve some callousness – i.e., lack of emotion or sympathy,

8    emotional insensitivity, indifference to the feelings or suffering of others."  *Trunzo v. Ornoski*,

9    2008 WL 703770, at *12 (N.D. Cal. Mar 13, 2008) (quoting *In re Smith*, 114 Cal.App.4th at

10   366).  The California courts have stated that in order to demonstrate "an exceptionally callous

11   disregard for human suffering" within the meaning of applicable provisions of the California

12   parole statutes, "the offense in question must have been committed in a more aggravated or

13   violent manner than that ordinarily shown in the commission of second degree murder.  Such

14   circumstances may include 'rehearsing the murder, executing of a sleeping victim, stalking,' or

15   evidence that the defendant 'acted with cold, calculated, dispassion, or that he tormented,

16   terrorized or injured [the victim] before deciding to shoot her; or that he gratuitously increased or

17   unnecessarily prolonged her pain and suffering.'"  *In re Smith*, 114 Cal.App.4th at 367 (internal

18   citation omitted); *see also Leon v. Kane*, 2008 WL 2705156, at *12-13 (E.D. Cal. July 8, 2008).

19   In *Smith*, the petitioner was convicted of second degree murder for killing his wife after

20   learning that his disintegrating marriage was beyond repair as a result of his wife's

21   unfaithfulness.  *In re Smith*, 114 Cal.App.4th 343.  When the victim told the petitioner that she

22   "did not want anything further to do with [him]," he took a gun and shot her once in the head and

23   then twice more as she fell.  *Id*. at 351.  The court found that the crime was not cruel or callous

24   to the suffering of others and stated:

25   ////

26   ////

27

> There is no evidence that [the petitioner] acted with cold, calculated dispassion; or that he tormented, terrorized, or injured [the victim] before deciding to shoot her; or that he gratuitously increased or unnecessarily prolonged her pain and suffering. . . . Was the crime callous? Yes. However, are the facts of the crime some evidence that [the petitioner] acted with exceptionally callous disregard for [the victim's] suffering; or do the facts distinguish this crime from other second degree murders as exceptionally callous? No.

*Id.* at 367; *see also In re Lee*, 143 Cal.App.4th at 1409 ("measure of atrociousness is not general notions of common decency or social norms . . . . Rather, the inquiry is whether among murders the one committed by Lee was particularly heinous, atrocious or cruel").

In another similar case in which the petitioner was convicted of second degree murder for killing his wife, a federal district court also found that the facts surrounding the murder did not support a finding that the murder was cruel or callous. The court summarized the facts as follows:

> [T]he day before the shooting, petitioner and his wife had a lengthy discussion about their marital problems and decided to make a further attempt to repair their marriage. The next day, his wife told him she wanted to stay in town to drink after work; when he later found her at the Moose Lodge, she was with another man. Upset, he slapped her and left, drank some more and then returned home and went to bed. When he woke up, his wife was not home, so he returned to the Moose Lodge and found her dancing with another man. He ordered a drink, waited for the music to stop, and then asked if she was ready to go home. When his wife said she was going to go home with Ron, her dancing partner, he put his arm around her and shot her in the chest.

*Pirtle v. Cal. Bd. of Prison Terms*, 2007 WL 1140817, at *13 (E.D. Cal. Apr. 17, 2007) (internal citations omitted).

In this case, as in *Smith* and *Pirtle*, even assuming the Governor's version of the facts surrounding petitioner's commitment offense are correct, there is no evidence that petitioner's murder of his wife was exceptionally callous or cruel. There is no evidence that petitioner "acted with cold, calculated, dispassion, or that he tormented, terrorized or injured [his wife] before deciding to shoot her; or that he gratuitously increased or unnecessarily prolonged her

1   pain and suffering."  Additionally, petitioner avers that he did not intend to kill or hurt anyone

2   when he fired the gun, and that his actions reflected a second degree implied-malice murder.

3   Pet. at 28.

4          Nonetheless, even if petitioner's crime was particularly callous or atrocious at the time it

5   was committed, the role of the Governor – and the role of the state courts upon review of the

6   Governor's decision – was to conduct an individualized suitability determination for petitioner

7   and to focus upon the public safety risk currently posed by petitioner.  *In re Lawrence*, 44

8   Cal.4th at 1205-06, 1217, 1221.  The relevant inquiry "is not merely whether an inmate's crime

9   was especially callous, or shockingly vicious or lethal, but whether the identified facts are

10  probative to the central issue of current dangerousness when considered in light of the full record

11  before the Board or the Governor."  *Id.* at 1221; *In re Dannenberg*, 34 Cal.4th at 1070-71.

12         For the reasons elaborated by the Board, the circumstances of petitioner's commitment

13  offense were not predictive of his current dangerousness, especially when considered in light of

14  the extensive evidence of petitioner's in-prison rehabilitation and exemplary behavior over the

15  18½ years he had spent in prison as of the time of the 2004 parole suitability hearing, as well as

16  the fact that petitioner was out on bail, without incident, for approximately two years between

17  the commitment offense and his conviction.  *In re Lawrence*, 44 Cal.4th at 1205-06, 1217, 1221;

18  *In re Elkins*, 144 Cal.App.4th 475, 498-99 (2006) (internal citations omitted) ("[T]he

19  commitment offense . . . is an unsuitability factor that is immutable and whose predictive value

20  'may be very questionable after a long period of time.' . . . Reliance on an immutable factor,

21  without regard to or consideration of subsequent circumstances, may be unfair, run contrary to

22  the rehabilitative goals espoused by the prison system, and result in a due process violation.").

23         Prior to reversing the Board's decision, the Governor acknowledged that petitioner had

24  no prior criminal record; worked for 17 years for the same employer where he rose to a

25  supervisory position prior to entering prison; was completely discipline free in prison; earned an

26  Associate's Degree and a Bachelor's Degree while in prison; held several institutional jobs and

1  received positive work reports while in prison; received complimentary reports from several

2  correctional staff members regarding his professionalism, dependability, and work ethic;

3  participated in several self-help and therapy programs while in prison, including attendance at

4  Alcoholics Anonymous meetings, and therapy related to anger and stress management;

5  volunteered numerous hours to tutor other inmates; and used his time in prison to better himself

6  and to help others do the same.  Ans., Ex. 2.

7          Moreover, since his initial psychiatric evaluation for parole suitability in 1987, mental

8  health professionals consistently found that, based on his lack of a criminal history, his

9  exemplary behavior in prison and his efforts to improve himself, petitioner was unlikely to pose

10  a danger to society if he were released from prison.  App. Ct. Rec., at 349-413.  For example, in

11  1987, a psychiatrist concluded that petitioner was "in prison because of a crime of passion and,

12  overall, I would say that the prognosis is good, that he would go home and never return to

13  prison."  *Id*. at 413.  In 1996, a psychologist noted that, "no one has ever seen [petitioner] engage

14  in any kind of angry outburst.  This inmate has managed to steer completely clear of the kinds of

15  troubles inmates ordinarily get themselves into."  *Id*. at 393.  A psychologist wrote in 1998 that

16  petitioner's "important behavioral controls are in place and functioning fruitfully."  *Id*. at 389.  In

17  1999, a different psychologist concluded that the offense was "a singular incident in his life,

18  which was out of character, with the likelihood of re-occurrence extremely low."  *Id*. at 381.

19  The psychologist who evaluated petitioner in 2001 believed that petitioner's "dangerousness is

20  lower than average," and that the murder was "a singular incident in his life, which was out of

21  character, with the likelihood of re-occurrence extremely low."  *Id*. at 365.  In 2002, a

22  psychologist determined that petitioner would "not present a problem to society," because he had

23  "quite good impulse control and should be capable of controlling any sexual, anger or aggressive

24  impulses."  *Id*. at 357.  The psychologist also found that petitioner had "excellent social and

25  verbal skills, presents very well, is sincere, straightforward, responsible and considerate," and

26  "has empathy for his fellow man."  *Id*.

1      Before the Board found petitioner suitable for parole in 2004, petitioner was denied

2    parole on several other occasions and was granted parole by the Board in 2001, 2002, and 2003.

3    And, significantly, unlike the petitioners in *Biggs*, *Sass* and *Irons*, at the time of the Governor's

4    decision to reverse the 2004 grant of parole, petitioner had already served almost 19 years in

5    prison – 4 years beyond his minimum sentence of fifteen years.

6      Because there was simply no evidence in the record to demonstrate that petitioner

7    constituted a current threat to public safety, the Governor's reliance upon petitioner's

8    commitment offense to deny petitioner parole in November 2004 violated petitioner's right to

9    due process.  Accordingly, the state courts' decision to uphold that reversal was contrary to

10   and/or involved an unreasonable application of federal law and petitioner is therefore entitled to

11   federal habeas relief.  *See Tash v. Curry*, 2008 WL 3984597, at *12 (N.D. Cal. Aug. 27, 2008)

12   ("In light of the extensive evidence of Petitioner's in-prison rehabilitation and exemplary

13   behavior, the reliance on the unchanging facts of the murder to deny Petitioner parole for the

14   tenth time – twenty-two years into his minimum seventeen year sentence – violated his right to

15   due process."); *Saldate*, 2008 WL 2705551, at *8 (finding the BPH's denial of parole for

16   petitioner at his fifth parole hearing violated due process because the BPH relied upon "past,

17   unchanging factors that [did not support] a finding the petitioner currently pose[d] an

18   unreasonable risk of danger to the public, especially in light of Petitioner's conduct from 1990

19   onwards."); *Trunzo v. Ornoski*, 2008 WL 703770, at *17 (N.D. Cal. Mar. 13, 2008) (holding that

20   the Board's continued reliance on the petitioner's commitment offense and criminal history

21   "effectively convert[ed his] sentence of life with the possibility of parole into life without the

22   possibility of parole, which violate[d his] liberty interest in parole."); *McCullough v. Kane*, 2007

23   WL 1593227, at *9 (N.D. Cal. June 1, 2007) ("In light of the extensive evidence of [the

24   inmate's] in-prison rehabilitation and exemplary behavior, the reliance on the unchanging facts

25   of the murder and his juvenile criminality to deny him parole 21 years into his 15-to-life

26   sentence violated his right to due process.  The some evidence standard provides more protection

than against fabricated charges or bureaucratic mistakes - the some evidence standard also protects against arbitrary decisions.  The Governor's decision was arbitrary and therefore did not comport with the some evidence standard."); *Brown v. Kane*, 2007 WL 1288448, at *6 (N.D. Cal. May 2, 2007)[11] ("at some point after an inmate has served his minimum sentence the probative value of his commitment offense as an indicator of 'unreasonable risk of danger to society' recedes below the 'some evidence' required by due process to support a denial of parole."); *Pirtle*, 2007 WL 1140817, at *12-13 ("[T]he Board relied on factors no longer within petitioner's control-the nature of the crime and his prior history, both criminal and social, while barely acknowledging petitioner's clean institutional record, steady work history, maturity and introspection-rendering the decision to deny him parole arbitrary and a violation of his liberty interest in parole."); *Thomas*, 513 F. Supp. 2d at 1136 ("This case is just the sort of case *Biggs* envisioned, where the commitment offense is repeatedly relied on to deny parole notwithstanding the prisoner's exemplary behavior and evidence of rehabilitation since the commitment offense.  The murder here, while terrible, was not notably worse than other second degree murders.  And the crime was aberrant behavior rather than part of continuing criminality. In light of the extensive evidence of [the inmate's] in-prison rehabilitation and exemplary behavior, the reliance on the unchanging factor of the murder to deny [the inmate] parole for the tenth time and 20 years into his 17-to-life sentence violated his right to due process."); and *Masoner v. State*, No. CV-03-1261-ER (C.D. Cal. Jan. 23, 2004) (finding due process violation based on BPT's "continued reliance" on pre-conviction factors to justify denial of parole suitability after petitioner had served twenty-one years of fifteen years to life sentence for second degree murder, had participated in therapy and self-help programming and had impeccable prison record).

---

[11]   The court in *Brown* elaborated that "[a] decision to revoke parole based solely on an inmate's commitment offense that can no longer be considered probative of dangerousness to society would be arbitrary and not comport with the 'some evidence' standard."  2007 WL 1288448, at *6.  This is one of those cases.

1    The next step is to determine what relief is appropriate.  The relief petitioner seeks is

2  discharge from the five year parole term he is currently serving.  If the Governor had not

3  reversed the Board's suitability finding in November 2004, petitioner's five year parole term

4  would have commenced sometime between June 2004 (when the Board determined petitioner

5  was suitable for parole) and November 2004 (when the Governor completed his review of the

6  Board's decision).  Even assuming petitioner should have been paroled as soon as the Board

7  reached its decision, however, his five year parole term would not be completed until June 2009.

8  However, petitioner also challenges on due process grounds Governor Davis's reversal of the

9  Board's 2003 parole suitability finding, which might result in an earlier date for release from

10  parole; therefore, the court need not determine the precise date on which petitioner's parole term

11  would have commenced had the Governor not reversed the Board's 2004 parole decision.

12    C.    Petitioner's 2003 Denial

13    On June 12, 2003, the Board found petitioner suitable for parole and concluded that

14  petitioner had "a low risk of dangerousness upon release."  However, on November 5, 2003,

15  then-Governor Davis reversed the Board's suitability finding.  Petitioner argues the Governor's

16  reversal violated his constitutional due process rights because it was not supported by any

17  evidence that petitioner posed a danger to society.  Respondent does not address this claim and

18  instead addresses only Governor Schwarzenegger's 2004 reversal of the Board's parole

19  suitability finding.  Ans. at 2, n.1.  Because there are no reasoned state court opinions addressing

20  this claim, this court will independently review the record to determine whether the state courts'

21  denial of this claim was contrary to or an unreasonable application of clearly established federal

22  law.

23    In finding petitioner suitable for parole, the Board stated:

24        The prisoner has no juvenile record, he has a stable social history
         as exhibited by stable relationships with others.  He has had a
25        long-term marriage and long-term employment.  While in prison
         he has enhanced his ability to function within the law upon release.
26        Through participation in education programs he has acquired his

33

Associate of Arts Degree and then he attained his Bachelor's Degree.  He's participated in self-help programs, the most participation has been AA, Literacy Program, Stress Management, Anger Control, Life Skills and one-on-one therapy with [Dr. Langehaue] while at Tehachapi.  He's enhanced his ability to function through vocational programs having acquired his x-ray license and institutional job assignments.  He lacks a criminal history, not only as a juvenile but as an adult.  He has realistic parole plans which include a job offer and family support.  He has received no 115s and 128s since he was incarcerated and this clearly indicates significant improvement in self-control.  He also shows signs of remorse.  He indicated he understands the nature and magnitude of the offense and accepts responsibility for the criminal behavior and has a desire to change toward good citizenship.  The psychiatric report dated March 17, 2002 by Dr. William Kroes . . . is supportive of release.  Dr. Kroes states . . . : "Within a controlled setting, based on inmate's incarceration record and present personality, there is no manifest danger to self or others.  In a less controlled setting the inmate is considered likely to continue to do well." . . .  He also indicates that significant risk factors and precursors to violence are considered to be much less than average in comparison to other inmates.  In the most recent psychiatric report prepared by Charles E. Taylor, Ph.D., 5-2-2002, it is supportive of parole.  He states . . . : "Mr. Thompson has had an exemplary disciplinary history and has upgraded himself educationally and vocationally.  Even without that, he appears to have marketable skills and a productive work history.  His release plans sound realistic and he appears socially connected to others on the outside.  He admits the crime, accepts responsibility and shows remorse and empathy.  He has participated in self-help groups and is involved in helping others, peers – [t]his report period.  He does not have a criminal or substance abuse history.  He shows no particular anger, attitude, impulse or mood symptoms associated with a risk of dangerousness.  On the scale of low, medium and high he is considered to have a low risk of dangerousness upon release."

App. Ct. Rec., at 269-71.

In reversing the Board's suitability finding, Governor Davis relied heavily on the gravity of the offense.  He stated:

In finding [petitioner] suitable for parole, the Board of Prison Terms found that he lacked a juvenile and adult criminal history.  He was found to have a stable social history and to have enhanced his ability to function within the law through participation in educational, self-help and therapy groups, vocational programming and institutional job assignments.  The Board found he has demonstrated positive institutional behavior and has realistic

34

parole plans.  [Petitioner] was found to have shown signs of remorse and to accept responsibility for his criminal behavior.  The Board also found that his most recent psychiatric reports, both in 2002, are favorable.

I commend [petitioner] for his progress while incarcerated.  He has attended Alcoholics Anonymous consistently.  He has earned both his Associate of Arts and Bachelor of Arts degrees and was named a Dean's Scholar.  [Petitioner] has demonstrated positive institutional behavior and has no juvenile or adult criminal history.  Prior to incarceration, [petitioner] served in the military.  These are positive factors lending support to a finding of suitability for parole.  However, I believe they are outweighed by each of several negative factors indicating that [petitioner] would pose an unreasonable risk to public safety.

*Foremost, I believe the Board gave insufficient consideration to the gravity of [petitioner's] crime.*  Angry and jealous, [petitioner] flew into rage when he saw his former wife with her new boyfriend.  He pursued them with his car, pulled out his loaded gun and fired into Mr. Bodin's car.  Mr. Bodin attempted to escape, but [petitioner] was undeterred.  He continued to chase Mr. Bodin's car and fired another two shots at it.  Ms. Thompson was fatally struck in the head and arm.  Unbelievably, [petitioner] later called Ms. Thompson's brother and informed him he had shot at his sister.  Then, [petitioner] went to his brother's house and hid the murder weapon.  *Based on the gravity of this offense alone, I believe that consideration of the public safety requires a more lengthy period of incarceration.*

The circumstances surrounding the murder indicate [petitioner] acted with wanton disregard for human life.  Although during the June 2003 hearing he claimed that "he didn't have it in his heart to harm or hurt" anyone, the record does not support this.  Firing a gun three times at his ex-wife and her new boyfriend indicates otherwise.  If [petitioner] was not trying to hurt anyone, then why did he pursue them after the first shot and fire twice more?  In fact, he admitted he was angry and jealous when he saw them together.  It was this anger and jealousy that prompted his murderous rage.  As the Los Angeles District Attorney's Office noted at the June 2003 hearing, "there's no real rational explanation for the pursuit other than to continue the murderous assault."  I agree and find that the egregious facts of this crime are clearly more than the minimum necessary for a conviction of second degree murder.  Based on the exceptional indifference to human life [petitioner] demonstrated, I believe that public safety requires a longer period of incarceration.

In finding [petitioner] suitable for parole, the Board found he accepted responsibility.  I disagree.  Although [petitioner] attempts to claim responsibility, he has consistently implied that he acted in

self-defense and thereby minimizes his culpability.  Initially, he
alleged that he believed Mr. Bodin was reaching across the car to
retrieve a gun.  However, at the June 2003 hearing he admitted that
he could not see into Mr. Bodin's car.  Indeed, in several of
[petitioner's]  psychiatric evaluations he claims he "accidentally"
shot his ex-wife.  In his 1996 psychiatric evaluation he falsely
claimed he fired one shot only.  I do not believe [petitioner] has
been truthful or forthcoming about the crime.  I believe it was
[petitioner's] anger and jealousy that caused him to carry a loaded
gun, pursue his ex-wife and Mr. Bodin and fire three times into
Mr. Bodin's car.  I believe his present and past attitude towards the
murder are unacceptable and undermine his expression of
responsibility.  As such, I find [petitioner] is currently unsuitable
for parole.

In finding [petitioner] suitable for parole, the Board found that he
had a stable social history.  I disagree.  I find [petitioner's]
domestic violence history against the victim and the fact that prior
to the murder he drank a quart of Jack Daniel's and consumed
cocaine indicative of an unstable social history and are negative
factors weighing against parole.

The Los Angeles County Sheriff's Department wrote opposing
parole in 1993, 1995, and 2002, citing the gravity of the crime and
[petitioner's] history of domestic violence.  Likewise, the Los
Angeles County District Attorney's Office opposes parole,
expressing concerns over [petitioner's] lack of candor regarding
the crime noting that the crime was a premeditated, intentional
killing.  I agree and therefore I believe [petitioner] has not served
sufficient time to ensure rehabilitation.

I have reviewed the record carefully and have considered each of
the factors demonstrating suitability or unsuitability for parole
under California Code of Regulations, Title 15, section 2402.  In
this decision I have discussed the specific factors which I consider
particularly relevant to [petitioner].  I find that each of the negative
factors discussed above individually outweighs all of the positive
factors.  I believe that [petitioner] continues to pose an
unreasonable danger to society.  Therefore, I REVERSE the
Board of Prison Term's decision to parole [petitioner].

Pet.' Mot. for Summ. J., Ex. L (emphasis added).[12]

Again, in order to uphold Governor Davis's 2003 reversal of the Board's parole decision,

the state courts needed to find that his decision was based on "some evidence" in the record that

_____

[12] Although this document is attached to petitioner's motion for summary judgment,
respondent was ordered to file the complete state court record with this court.

1  petitioner constituted a current threat to public safety.

2          1.      Gravity of the Offense

3          In reversing the Board's 2003 decision, Governor Davis commended petitioner for "his

4  progress while incarcerated," but found that the progress was outweighed by the gravity of his

5  commitment offense.  The Governor found that the "circumstances surrounding the murder

6  indicate [petitioner] acted with wanton disregard for human life" and found that "the egregious

7  facts of [petitioner's] crime are clearly more than the minimum necessary for a conviction of

8  second degree murder."  Therefore, he stated that "[b]ased on the exceptional indifference to

9  human life [petitioner] demonstrated, . . . public safety requires a longer period of incarceration."

10         The Governor's statements that petitioner "acted with wanton disregard for human life"

11 and that the facts of petitioner's crime were "egregious" suggest that his finding of unsuitability

12 was based on the first circumstance listed in § 2281(c), that petitioner "committed the offense in

13 an especially heinous, atrocious, or cruel manner," and specifically, that petitioner's commitment

14 offense was carried out in a manner that demonstrated an exceptionally callous disregard for

15 human suffering.  *See* Cal. Code Regs. tit. 15, § 2281(c)(1), (c)(1)(D).  As discussed above, for

16 this section to justify overturning the Board's parole suitability finding, there must be "some

17 evidence" to support an exceptionally callous determination.  And, as discussed above, even

18 assuming the accuracy of the Governor's version of the facts surrounding petitioner's

19 commitment offense, there is no evidence that petitioner's murder of his wife was exceptionally

20 callous or cruel.  There is no evidence that petitioner "acted with cold, calculated, dispassion, or

21 that he tormented, terrorized or injured [his wife] before deciding to shoot her; or that he

22 gratuitously increased or unnecessarily prolonged her pain and suffering."  *In re Smith*, 114

23 Cal.App.4th at 367 (referencing Cal. Code Regs. tit. 15, § 2281(c)(1)(D)).

24         Moreover, as discussed above, even if petitioner's crime was particularly callous or

25 atrocious at the time it was committed, the circumstances of petitioner's commitment offense

26 were not predictive of his current dangerousness, especially when considered in light of

37

1  petitioner's in-prison rehabilitation and exemplary behavior over the 17 ½ years he had spent in

2  prison as of the time of the 2003 parole suitability hearing, as well as the fact that numerous

3  mental health professionals consistently found that petitioner was unlikely to pose a danger to

4  society if he were released from prison.

5      Before the Board found petitioner suitable for parole in 2003, petitioner was denied

6  parole on several other occasions and was granted parole by the Board in 2001 and 2002.  And,

7  at the time of the Governor's decision to reverse the 2003 grant of parole, petitioner had already

8  served almost 18 years in prison – 3 years beyond his minimum sentence of fifteen years.

9  Because there was simply no evidence in the record to demonstrate that petitioner constituted a

10  current threat to public safety at the time of the Governor's reversal, the Governor's reliance

11  upon petitioner's commitment offense to deny petitioner parole in November 2003 did not

12  constitute "some evidence" to support his decision.

13              2.    Failure to Accept Responsibility

14      The Governor also stated that he did not believe petitioner accepted responsibility for his

15  crime.  The Governor based this opinion on (1) petitioner's implication that he acted in

16  self-defense; (2) petitioner's allegation that he believed Mr. Bodin was reaching across the car to

17  retrieve a gun, in light of his later admission that he could not see into Mr. Bodin's car; (3)

18  petitioner's claims in his psychiatric evaluations that he "accidentally" shot his ex-wife; and (4)

19  petitioner's "false" claim in his 1996 psychiatric evaluation that he fired one shot only, leading

20  the Governor to conclude that petitioner has not "been truthful or forthcoming about the crime"

21  and to conclude that it was petitioner's "anger and jealousy that caused him to carry a loaded

22  gun, pursue his ex-wife and Mr. Bodin and fire three times into Mr. Bodin's car."  The Governor

23  stated that petitioner's "present and past attitude towards the murder are unacceptable and

24  undermine his expression of responsibility."

25      According to the regulations regarding suitability and unsuitability for parole, one of the

26  factors suggesting suitability (notably, not *unsuitability*) is whether "the prisoner has performed

38

1    acts that tend to indicate the presence of remorse or has given indications that he understands the

2    nature and magnitude of his offense."  Cal. Code Regs. tit. 15, § 2281(d)(3).  Whether petitioner

3    stated that he acted in self-defense, that he thought Mr. Bodin was reaching across the car to

4    retrieve a gun, or that he did not intend to kill his wife is not relevant to whether he was

5    remorseful or whether he understood the nature and magnitude of his crime of second-degree

6    murder.  Petitioner was not required to admit guilt to his crime in order to receive a parole

7    release date.  Cal. Penal Code § 5011(b) ("The Board of Prison Terms shall not require, when

8    setting parole dates, an admission of guilt to any crime for which an inmate was committed.").

9           Moreover, the Governor's conclusion that petitioner had not accepted responsibility for

10   his crime was not supported by the evidence.  To the contrary, the evidence in the record before

11   the Governor shows, in stark contrast, that petitioner was remorseful and understood the nature

12   and magnitude of his offense.  The Board concluded that petitioner "show[ed] signs of remorse"

13   and "indicated he understands the nature and magnitude of the offense and accepts responsibility

14   for the criminal behavior and has a desire to change toward good citizenship."  Additionally,

15   psychologists and psychiatrists have consistently believed that petitioner is remorseful and has

16   good insight into the nature and magnitude of his crime.  The psychologist who evaluated him in

17   1996 wrote, "[a]s the inmate talked about his crime he showed what came across as genuine

18   remorse."  App. Ct. Rec., at 392.  In 1999, a psychologist found that "Mr. Thompson's level of

19   insight into his behavior on that night appears [sic] solid in that he understands the main

20   motivational factor, as well as the extenuating circumstances that led to his behavior.  [His] level

21   of remorse for his action appears sincere."  *Id*. at 381.  The psychologist who evaluated him in

22   2001 found that, with respect to petitioner's insight into the crime and his level of remorse and

23   empathy, petitioner "understands the main motivational factor, as well as the extenuating

24   circumstances that led to his behavior" on the day of the murder.  *Id*. at 365.  Again, the

25   psychologist believed that petitioner's remorse was sincere.  *Id*.  The evaluator had no

26   recommendations about how petitioner could further prepare himself for release to parole.  *Id*. at

1 366.  Again in 2002, a psychologist believed that petitioner's expressions of remorse were

2 "authentic," and that petitioner's "attitude is one of deep regret.  He accepts responsibility for his

3 actions."  *Id*. at 356.  There simply is no evidence in support of the conclusion to the contrary.

4 Nonetheless, even if the Governor was correct that petitioner had not accepted responsibility for

5 his actions, it did not amount to evidence that petitioner posed a *current* danger to society.

6                           3.      Unstable Social History

7        The Governor also found that petitioner did not have a stable social history.  The

8 Governor found that petitioner's alleged "domestic violence history against the victim and the

9 fact that prior to the murder he drank a quart of Jack Daniel's and consumed cocaine" were

10 indicative of an unstable social history and were negative factors weighing against parole.

11        Petitioner avers in his verified petition that the Governor's findings that he had a history

12 of domestic violence against the victim and that prior to the murder he drank a quart of Jack

13 Daniel's and consumed cocaine were unsupported by the evidence in the record.  Pet. at 29.

14 Nonetheless, even if those facts were supported by the record, such facts did not support the

15 conclusion that petitioner had an unstable social history within the meaning of the relevant

16 suitability criteria regulation (again, petitioner's stable social history is not an *unsuitability*

17 criterion).  Section 2281(d)(2), entitled "Stable Social History," provides that whether a

18 "prisoner has experienced reasonably stable relationships with others" is a circumstance tending

19 to show suitability for parole.  Cal. Code Regs. tit. 15, § 2281(d)(2).  There was substantial

20 evidence in the record that petitioner had several stable relationships with others, including a

21 long-term stable relationship with his wife and long-term employment prior to entering prison.

22 Moreover, even if the facts regarding petitioner's alleged history of domestic violence and/or his

23 consumption of cocaine and a large amount of alcohol on the day of the murder were true, such

24 facts did not provide evidentiary support that petitioner currently presented an unreasonable risk

25 of danger to the public if released on parole, especially in light of petitioner's in-prison

26 rehabilitation and participation in several self-help and therapy programs while in prison,

1    including attendance at Alcoholics Anonymous and Narcotics Anonymous meetings.  Ans., Ex.

2    2.

3                    4.      Opposition of the Sheriff and District Attorney

4           In finding petitioner unsuitable for parole, the Governor also noted that "[t]he Los

5    Angeles County Sheriff's Department wrote opposing parole in 1993, 1995, and 2002, citing the

6    gravity of the crime and [petitioner's] history of domestic violence," and "the Los Angeles

7    County District Attorney's Office oppose[d] parole, expressing concerns over [petitioner's] lack

8    of candor regarding the crime [and] noting that the crime was a premeditated, intentional

9    killing."  Although opposition to parole by law enforcement is to be considered during the parole

10   process, Cal. Penal Code § 3046(c), "voiced opposition to parole is not an enumerated

11   unsuitability factor . . . and such argument is not evidence of unsuitability."  *Saldate v. Adams*,

12   2008 WL 2705551, at *6 (E.D. Cal. July 10, 2008).  Additionally, the opposition of the Sheriff's

13   Department was based upon the gravity of the crime and petitioner's purported history of

14   domestic violence and the District Attorney's Office was based upon the gravity of the crime and

15   petitioner's lack of candor regarding the crime – all of which were merely cumulative of the

16   Governor's own reasons for finding petitioner unsuitable for parole.  *Id.*  Finally, neither the

17   Sheriff's Department nor the District Attorney's Office focused on petitioner's *current*

18   dangerousness in opposing parole.  *Id.* at *3 (quoting *In re Tripp*, 150 Cal.App.4th 306, 313

19   (2007)) ("The denial of parole will not be upheld where the BPH "attaches significance to

20   evidence that forewarns no danger to the public or relies on an unsupported conclusion.").

21   Accordingly, the opposition of those organizations did not provide "some evidence" of

22   petitioner's current dangerousness to support the Governor's reversal.

23          For the above reasons, this court finds that the Governor's reversal of the Board's 2003

24   parole decision was not supported by some evidence, and necessarily, the state court decisions to

25   uphold that reversal were contrary to and/or an unreasonable application of clearly established

26   federal law.  Therefore, petitioner is entitled to habeas relief on that claim.  As noted earlier,

petitioner seeks discharge from his five year parole term.  If the Governor had not reversed the

Board's suitability finding in November 2003, petitioner's five year parole term would have

commenced some time in late 2003, and would now be complete.  *See Carlin v. Wong*, 2008 WL

3183163, at *2 (citing *In re Bush*, 161 Cal.App.4th at 144-45).  Therefore, petitioner should be

discharged from parole.  Because petitioner is entitled to the full relief he seeks, his claims

regarding the state's parole denials in 2000 and 2001 need not be addressed.

In accordance with the above , IT IS HEREBY RECOMMENDED that:

1.      Petitioner's application for a writ of habeas corpus be granted;

2.      Petitioner's motion for partial summary judgment be denied as moot;

3.      Respondents be directed to discharge petitioner from parole within 10 days of any

order adopting these findings and recommendations, provided that no legitimate grounds for

parole revocation developed or develop between the date of petitioner's release on parole and the

date on which the 10 day time limit expires; and,

4.      Respondents be directed to file, within 10 days of petitioner's discharge from

parole, a notice with the court confirming the date on which petitioner was discharged from

parole.

These findings and recommendations are submitted to the United States District Judge

assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

within the specified time may waive the right to appeal the District Court's order. *Turner v.*

*Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated:  February 20, 2009.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE